KIRBY LUMBER CO. v. DAVIS. (No. 451.)

(Court of Civil Appeals of Texas. Beaumont. May 7, 1919. Rehearing Denied June 4, 1919.)

1. RAILROADS ⬡276(2) — NEGLIGENCE — LICENSEE—DUTY OF CARE.

A lumber company owes a licensee on its log train no duty with respect to the condition of its track, cars, or other instrumentalities; its sole duty being to exercise ordinary care in the operation of the train.

2. RAILROADS ⬡276(2) — NEGLIGENCE — LICENSEE—DUTY OF CARE.

Where a logging company permitting a licensee to ride on its logging train creates a new danger after he is on the train, by making up its train in a manner not before used by it, it must assume with reference to such new hazard the responsibility of exercising due care to protect him from injury resulting by reason thereof.

3. RAILROADS ⬡282(16) — INJURY TO LICENSEE—FINDINGS.

A finding that defendant's logging train, on which plaintiff was permitted to ride, was negligently operated, considering the condition of track, the manner of coupling, and the speed, *held* to warrant judgment in plaintiff's favor, though the jury had answered that the speed of the train was not excessive.

Appeal from District Court, Newton County; H. T. Davis, Judge.

Suit by A. L. Davis against the Kirby Lumber Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Andrews, Strutman, Logue & Mobley, of Houston, for appellant.

J. B. Forse, of Newton, and C. D. Ferguson, of Houston, for appellee.

WALKER, J. A. L. Davis, appellee, sued the Kirby Lumber Company, appellant, in the district court of Newton county, Tex., for damages on account of personal injuries sustained by him on or about the 21st day of December, 1915. The cause was tried to a jury, and submitted on special issues. On the answers of the jury to the special issues, judgment was rendered in favor of appellee for the sum of $1,000, and from this judgment appellant has appealed to this court.

The plaintiff alleged, in substance, that the

defendant on and prior to December 21, 1915, owned and operated in the exercise of its corporate powers a logging railroad from Call Front to Call, in Newton county, Tex.; during the period of the operation of said logging railroad the employés, agents, and officers of the defendant in charge of the trains, operated upon and over said road, habitually and customarily, and openly, notoriously, and continuously, carried persons and passengers in and on said trains from point to point along said road, which custom and practice was known to and acquiesced in by the defendant; that on December 21, 1915, the plaintiff in good faith and in pursuance of said custom went aboard one of the trains of defendant at Call Front for the purpose of being carried to or near Bon Wier, and with the knowledge and consent of the employés, agents, and officers of said defendant in charge of said train, took passage thereon in the caboose attached to the said train, by reason whereof the plaintiff agreed and undertook to transport plaintiff to his destination; that while plaintiff was a passenger on said train, and was being transported by defendant as aforesaid, a portion of the train, including the caboose in which plaintiff was riding, was derailed, and as a consequence plaintiff sustained the personal injuries which were made the basis of his complaint.

It was further alleged by the plaintiff that at and above the point of derailment the tracks and roadbed declined and lay on a down grade, curved sharply, and were rough and uneven, and that immediately above the point of derailment were frogs and switches, and that the rails of the track on the outer edge of the curve were not elevated, and the roadbed was not inclined toward the outer edge, and that immediately below the point of derailment the grade reached its lowest point, and the road began an upgrade, ascending a hill; that the rear portion of the train which plaintiff was riding, was defectively, insecurely, and unsafely coupled to the remainder of the train by a cable or chain, or both, and that the drawheads of said cars were not coupled otherwise, and that the defendant, with knowledge of such conditions, propelled and operated the train, which was long and heavily loaded, on and over the tracks at a fast and excessive rate of speed, and while so doing the coupling broke, and the caboose and other cars were derailed.

Appellant summarizes its pleading as follows:

"In so far as the answer of the defendant is material to be considered upon this appeal, it may be stated that the defendant pleaded the general denial."

The special issues submitted to the jury, together with their answers, are as follows:

"Question No. 1. Was the rear portion of the train that plaintiff was riding on defectively or unsafely coupled to the remainder of said train by a cable or chain, or both, and not otherwise?"
To this question the jury answered "Yes."
"Question No. 2. Was the coupling of said train as set out in question No. 1 'negligence,' as that term has been defined to you?"
To this question the jury answered "Yes."
"Question No. 3. Did the defendant, with knowledge of the manner in which said train was coupled, operate it over its track at the time of the injury?"
To this question the jury answered "Yes."
"Question No. 4. Was such act upon the part of defendant negligence?"
To this question the jury answered "Yes."
"Question No. 5. Was the defendant operating said train, at the time of the injury, at an excessive rate of speed?"
To this question the jury answered "No."
"Question No. 6. Give in figures the number of miles per hour said train was traveling at the time of the injury."
To this question the jury answered: "30 miles per hour."
"Question No. 7. Was the running of the train at an excessive rate of speed at the time of the injury negligence?"
To this question the jury answered "No."
"Question No. 8. Was the act set out in question No. 1, or the act set out in question No. 3, or the act set out in question No. 5, the proximate cause of the plaintiff's injury?"
To this question the jury answered: "Yes, 1 and 3."
"Question No. 9. Was the plaintiff, at the time of the injury, a licensee upon the train of the defendant?"
To this question the jury answered "Yes."
"Question No. 10. What sum of money, if paid now, will compensate 'the plaintiff for the injury sustained?"
To this question the jury answered: "$1,000."
"Question No. 11. Were two of the cars in the train upon which the plaintiff, A. L. Davis, was riding coupled together by means of a cable and chain or either of them?"
To this question the jury answered "Yes."
"Question No. 12. Was the defendant, Kirby Lumber Company, negligent in operating said train over the track in the condition in which you find it to have been and at such speed as you find said train was running, with two of its cars coupled together (if you have answered that two of its cars were so coupled together) by means of a cable and chain, or either of them?"
To this question the jury answered "Yes."
"Question No. 13. If you have answered in response to No. 12 above that defendant was negligent in operating its train, was such negligence the proximate cause of plaintiff's injury?"
To this question the jury answered "Yes."

Briefly stated, the facts are as follows:
Plaintiff, on the day of the wreck, went to the defendant's camp at Woodmyer, and boarded the engine at the roundhouse or shop. Afterwards, the engineer took charge of the engine and ran it a distance of about

100 yards to a spur, on which the caboose was standing, and coupled the engine to the caboose. At this point plaintiff got off the engine and boarded the caboose. Other people were getting on the caboose at that time, and it was well filled when plaintiff got on. Mr. Woods, defendant's superintendent, was present. The engine and caboose then proceeded to a make-up spur about a mile from the camp, and the caboose was left on the main line while the engine went to a set-out spur and made up the train of log cars, returning with the cars and coupling onto the caboose about 25 minutes later. The superintendent was also present at that time. In this train of log cars were two fastened or tied together with a cable or chain. This cable was taken from the caboose. During this time plaintiff was in the caboose and had no knowledge of the cable coupling. The cars which were coupled by the cable were placed in the body of the train, in front of the caboose, which was the rear car in the train. The train, consisting of an engine, about 32 loaded log cars and the caboose, thus made up, proceeded towards Call, and had gotten a short distance beyond Woodmyer when the wreck occurred. The road from Woodmyer descended into a valley between two hills, forming steep grades, and the wreck occurred at the bottom of the valley at a curve in the track. It was shown that before the log cars were coupled to the caboose there was a slack of a foot or more in the cable coupling.

As to the nature and effect of this chain coupling, B. P. Parker, a witness for the plaintiff, testified as follows:

"I am familiar with the character of log cars used by the Kirby Lumber Company at that time. They were practically the same as we used here; they were skeleton log cars. I am also familiar with the character of couplings on those cars that were in use then. They are a link and pin coupling. They used a link with two pins to make the coupling. A pin was fastened to the link in each drawhead. One of those links is between 8 and 10 inches long. The idea of the link is to hold the drawheads as close together as possible so that there won't be any slack. That link tends to hold the drawheads together. When coupled in that manner, it would not be possible for the drawheads to pass each other and jamb. The drawhead is fastened to what I believe they call reachers. If, instead of being coupled by the link and pins, those drawheads were fastened together by a wire cable of about three-fourths of an inch in diameter, and also by a toggle chain and the cable wrapped through the drawhead and tied onto the reacher, we would call that a bad-order coupling; that is the railroad term. If that character of coupling is made, there would be more slack in the coupling, or a greater distance between the drawheads when a pull is made than there was before the pull was made, because they can't tie a cable by hand tight enough, but what the power of locomotion will make the distance a little more. If there was

a distance of slack of one foot or 18 inches, and the train was going down hill, as to what would be the action of one drawhead on the other, will say, if it is absolutely straight track, the drawheads will just go up against each other, and of course that would retard the motion of the rear train. If it is not on a straight track, but going around a curve, that would make a difference in the action of the two drawheads; the drawheads would have a tendency to want to pass each other; if they did pass each other, it would throw a terrible strain on the wheels, and would exert pressure on the rail. The pressure would be on both rails; the pressure would be outward on each rail. There would be a probability of that pressure being sufficient to break the rail; it would depend on the condition of the rail. A rail is like any other steel; it crystallizes sometimes. Sometimes they will snap right in two, and sometimes they will bend a good ways and won't break. In cases where there are broken rails, the first car that reaches it is not necessarily derailed; I have known whole trains to go over a broken rail and not have a derailment. It is possible for part of a train to go over a broken rail and a subsequent portion of the train be derailed by reason of it. As to whether or not chain-ups of the character mentioned are usually made in the middle of the train, will say, I never tram-roaded any, but on railroads we put them in the rear of the train; it is always considered a dangerous proposition."

It was also shown that there was a broken rail at or near the place of the wreck. A portion of the train, consisting of several logs cars and the caboose, became detached, and all but the two head cars of such portion were derailed. Plaintiff's witnesses stated that the front car of the detached portion was coupled by the cable to the rear car of the front portion of the train. This was sharply denied by defendant's witnesses, their testimony tending to show that the coupling which broke was a link and pin, but the engineer said there was a cable coupling on one of the cars.

Another sharp conflict in the evidence was with reference to the rate of speed at which the train was running at the time of the wreck, and as to whether such rate of speed exceeded the customary speed at that point. Plaintiff's witnesses estimated the rate of speed at 35 or 40 miles per hour, and as being in excess of the usual speed. Defendant's witnesses on that point stated 18 or 20 miles an hour at the time of the wreck, but that in coming down the hill from Woodmyer, the speed was 30 miles an hour, and that the speed and operation of the train on that occasion were the same as usual at that point. In answer to question No. 6, the jury found that the speed was 30 miles an hour.

After the verdict was returned, each party filed a motion asking that judgment be rendered in its favor. On hearing these motions, the court rendered judgment in favor of plaintiff, and overruled appellant's motion. Appellant filed many exceptions to the

court's charge, but all these have been waived by it, and no error is assigned to any proceeding in the trial of the case, except to the action of the court in granting the motion of plaintiff for the entry of judgment, and in overruling the motion of defendant to enter judgment in its favor, on the answers of the jury.

[1, 2] Appellant's first proposition is as follows:

"The jury having found that the plaintiff was a licensee on the defendant's log train, the defendant owed the plaintiff no duty with respect to the condition of its tram track or the condition of its logging cars or other instrumentalities; the sole duty owed by the defendant to the plaintiff being to exercise ordinary care in the operation of the train."

As an abstract legal proposition, we think this is correct. However, this proposition is not the law of this case. The jury found that the plaintiff was a licensee. In order for the plaintiff to recover in this case, his rights must be measured by the duties owed him as a licensee by the appellant. He accepted the condition of the track and the train as he found them. The appellant was under no obligations to the plaintiff to depart from its usual methods of operating its train because of the presence of the plaintiff, but the plaintiff was riding on this train before this defective coupling was made, having ridden something over a mile. There is nothing in the record to show that this cable coupling was customarily or ordinarily resorted to by the appellant. Having undertaken to carry the plaintiff as a licensee, the law required the appellant to exercise ordinary care in making up its train, ordinary care being measured by the usual custom, method, and manner used by the plaintiff from time to time in making up its log trains.

When the licensor creates a new danger, after the licensee comes on the premises, it must assume, with reference to such new hazard, the responsibility of exercising due care to protect the licensee from injury resulting by reason thereof.

As said by Chief Justice Gaines in Washington v. M., K. & T. Ry. Co., 90 Tex. 314, 38 S. W. 764, in order to entitle a licensee to recover, he must prove:

"That the derailment was the result of a want of due care, either in the equipment or operation of the train, on part of the agents or servants of the company."

Also the rule is further announced by Judge McMeans in Houston Belt & Terminal Co. v. O'Leary, 136 S. W. 601:

"It has been often held that, where a person is rightfully upon the premises of another, even as licensee, he has the right to require of the proprietor that he so conduct himself as to not injure him through his act of negligence. This rule has been applied and followed in many cases in this state where a licensee has entered upon the right of way of a railway company, and, while using, with ordinary care, the track for purposes of his own, is injured by the affirmative negligence of the railway company or its employés."

In answer to questions Nos. 1 and 2, the jury found that the use of this cable coupling was negligence. In answer to question No. 3, they found that the defendant, with knowledge of the manner in which the train was coupled, operated it over its track. To question No. 8 the jury found that this cable coupling was the proximate cause of plaintiff's injury. Also the jury answered "Yes" to question No. 11, it being as follows:

"Were two of the cars in the train upon which the plaintiff, A. L. Davis, was riding coupled together by means by a cable and chain, or either of them?"

—and answered "Yes" to question No. 12, this question being as follows:

"Was the defendant, Kirby Lumber Company, negligent in operating said train over the track in the condition in which you find it to have been and at such speed as you find such train was running, with two of its cars coupled together (if you have answered that two of its cars were so coupled together) by means of a cable and chain or either of them?"

[3] Though the jury had answered that 30 miles per hour was not an excessive rate of speed, yet in determining whether the train was negligently operated at the time of the injury, considering the manner of its coupling, it was the duty of the jury to consider this speed. Hence, in answering question No. 12, in determining the negligence of the defendant in operating its train, the jury properly considered the condition of the track, the rate of speed, and the manner in which the cars were coupled together, and, having considered these different elements and having found that the defendant was negligent therein, there being no exception to this question, the appellant is bound thereby.

As we understand appellant's brief, it concedes, in effect, that the judgment should be sustained if the answer to question No. 12 is not explained and limited by the answers of the jury to the preceding questions, appellant saying:

"If we were dealing with question No. 12 alone, the answer of the jury would perhaps be sufficient to support a judgment in the plaintiff's favor."

Giving this effect to all the issues submitted to the jury and their answers thereto, we do not think the effect of the answer to question No. 12 can be so explained as to relieve appellant of liability.

Finding no errors in this record, this case is affirmed.